## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**JON O'NEAL SHIELDS,** and
**CHRISTINA M SHIELDS**,

Case No. **08-61066-13**

Debtors.

# MEMORANDUM OF DECISION

At Butte in said District this 24th day of March, 2009.

In this Chapter 13 case the Debtors filed on September 23, 2008 (Docket No. 27) a motion to avoid a judicial lien of Allegra Ltd ("Allegra") pursuant to 11 U.S.C. § 522(f)(1)(A), alleging that the market value of the Debtors' interest in their homestead is the amount of $629,100.00.  Allegra filed an objection (Docket No. 30) contending that the value of the homestead is between $880,000 and $930,000, and therefore that Debtors cannot satisfy their burden under the formula set forth at § 522(f)(2)(A).  A hearing on Debtors' motion was held after due notice at Missoula on February 12, 2009.  Debtors and Allegra appeared represented by counsel.  Testimony of witnesses was heard and Exhibits ("Ex.") 1, 2, 3, 4, 5, 6, 7, A, B, C, and D were admitted into evidence without objection.  At the conclusion of the parties' cases-in-chief the Court took the matter under advisement.  After review of the record and applicable law, the matter is ready for decision.  For the reasons set forth below Allegra's objection will be overruled, Debtors' motion to avoid lien will be granted, and Allegra's judicial lien will be avoided entirely under §§ 522(f)(1)(A) and (f)(2)(A), based on the appraisal prepared by certified

1

Member of the Appraisal Institute ("MAI") appraiser Thomas G. Stevens ("Stevens"), Ex. 7. The Court rejects the appraisal valuation of the Debtors' homestead offered by Allegra from MAI appraiser Kraig P. Kosena ("Kosena"), Ex. B, and the Comparable Market Analysis ("CMA") prepared by realtor Laurie Sorum ("Sorum"), Ex. A.

This Court has jurisdiction in this case under 28 U.S.C. § 1334(a). Debtors' motion to avoid Allegra's lien to the extent it impairs Debtors' exemption is a core proceeding under 28 U.S.C. § 157(b)(2)(K) and F.R.B.P. Rule 4003(b). This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

Debtors Jon O'Neal Shields ("Jon") and Christina M. Shields ("Christina") (together "Debtors" or "Shields") both appeared at the hearing and testified, represented by attorney Daniel S. Morgan ("Morgan") of Missoula, Montana. Allegra was represented by attorney Quentin M. Rhoades ("Rhoades") of Missoula, Montana. MAI appraisers Stevens and Kosena each testified, as did real estate agent Sorum.

## FACTS

Jon and Christina Shields are married and have 4 children. Jon is an attorney, and before attending law school he was a carpenter. Christine is a trained nurse but works now as a paralegal.

Together the Shields have purchased, renovated and sold several homes. They try to buy houses at low prices, fix them up and sell them. Christina testified that they have owned two other homes in the University District of Missoula since 1997. Shields have owned their

2

residence at 333 University Avenue[1] in the "University District" near the University of Montana in Missoula since they purchased it in November of 2003 for $500,000. Jon testified that they bought 333 University Ave. at a short sale from a previous owner, who had purchased the house in a "wrecked" condition after it had housed a fraternity. When they bought it, he testified, the house was still in "tough" shape. He testified that the condition of the house is now "fair."

Jon denied that they or anyone else has performed a total renovation of 333 University Ave., or that they converted it from a fraternity house to a single family house. He testified that they have done some painting, changed some lighting and switches, and that the previous owner had done some structural work and wiring. Jon testified that the layout of 333 University Ave. does not compare well with other homes in a price range between $700,000 to $750,000, which he stated will purchase a new home with a beautiful kitchen in the University District. Ex. 7 describes a two-car garage constructed next to the house within the past 18 months at a cost of $45,000.

Allegra obtained a foreign judgment against the Shields in the State of Washington which was filed in the Montana Fourth Judicial District Court, Missoula County, on September 27, 2007, Case No. DV-07-987, creating a judicial lien. Ex. 1. Jon testified that he stipulated to entry of judgment, which arose from a commercial real estate development in which he was involved in Missoula, wherein he guaranteed repayment of a loan from Allegra.

Jon testified that a principal of Allegra, who he identified as Boris Castellanos ("Castellanos"), was in Debtors' house once or twice before their dispute. They were negotiating

---

[1]Ex. 4 provides the legal description as "Lots 8 and 9 in Block 22 of Hammond Addition, a platted subdivision in Missoula County, Montana."

3

with Allegra about entering into a partnership, and Jon testified that they invited Castellanos over for dinner.  He testified that Castellanos saw the kitchen at 333 University Ave. but did not get a tour of the entire house, and his visit was before Jon and Christina had the garage built.

Christina testified that they listed their home for sale in November 2007 until July of 2008[2], with an initial asking price of $995,000.  She testified that their realtor was reluctant to list the property at $995,000, but that they wanted to list at that price to have enough to pay off their creditors.  Jon testified that they raised their listing price to $1,099,000.  They did not receive any offers.[3]  On February 7, 2008, Jon and Christina filed a Declaration of Homestead claiming 333 University Avenue as their homestead.  Ex. 2.

Christina testified that in her opinion the housing market in the University District is saturated.  Since last summer, she testified, eight homes in her three-block area have not sold, and for more than a year she has noticed that high priced homes in the area are not selling, even though owners are dropping their prices.  She testified that in her opinion the "fire sale" value of 333 University Ave. is $612,900, which she stated was the tax assessment value.  However, she testified that she would not willingly sell the home at a price of $612,900.  She admitted that she valued the home at $750,000 as of January 2008, but she testified that in her opinion the housing market for homes in the University District declined from January to August 2008.  Christina testified that she agrees with the $740,000 appraisal value in Stevens' Ex. 7, and Jon agreed that Stevens' appraised value is within his own price range opinion.

Debtors filed their Chapter 13 petition on August 6, 2008, and filed their Schedules,

_____

[2]Ex. B states at page 26 that the listing was withdrawn on July 29, 2008.

[3]She testified that other realtors who showed the house left their own estimates of value.

4

Statements and Plan on August 21, 2008.  On Schedule A (Ex. C) Debtors list their home at 333

University Avenue at a current value of $629,100, encumbered by secured claims stated in the

amount of $557,020.  Schedule C lists both Jon's and Christina's homestead exemptions in the

amounts of $125,000 apiece, claimed under MONTANA CODE ANNOTATED ("MCA") § 70-32-

101 to 104.  No objections to Debtors' homestead exemptions have been filed, so Debtors have

allowed homestead exemptions in the total amount of $250,000.  Schedule D lists secured

claims, including claims secured by Debtors' homestead identified as Allegra, Chase Home

Finance ("Chase") ($396,000), Liberty Electric ($1,028.40), Molly Bennett ($60,000), and

Sterling Savings Bank ($100,000).  Ex. C.

Ex. 4 is Chase's account statement for Jon's account, stating the principal balance as of

7/25/08 in the sum of $396,388.98.  Ex. 6 is the Shields line of credit ("LOC") August 2008

account statement from Sterling Savings Bank showing a balance in the sum of $102,285.71.

Allegra filed Proof of Claim No.  11, and amended it on October 23, 2008 (Ex. D) asserting a

claim in the amount of $87,581.70 secured by a judgment, Ex. 1.  Claim No. 11 states the value

of Allegra's security as $880,000.  Sorum's CMA, Ex. A, is attached to Claim No. 11.

Molly Bennett filed Proof of Claim No. 18 on October 3, 2008, asserting a secured claim

in the amount of $60,383.87 as of the petition date, secured by 333 University Ave.  No objection

to Claim No. 18 has been filed and it constitutes prima facie evidence of its validity and amount

under F.R.B.P. 3001(f).

Liberty Electric filed Proof of Claim No. 28 on October 30, 2008, asserting a secured

claim in the amount of $987.56, secured by a construction lien and default judgment.  No

objection to Claim No. 28 has been filed and it constitutes prima facie evidence of its validity

5

and amounts under F.R.B.P. 3001(f).

The total amount of claims secured by 333 University Ave. shown by the evidence is

$647,627.82.[4]  Adding that amount to Debtors' total allowed $250,000 exemptions under §

522(f)(2)(A)(iii) gives a total under § 522(f)(2)(A)(i) through (iii) in the amount of $897,627.82.

**Kosena Appraisal Testimony – Ex. B.**

Kraig Kosena is a MAI certified real estate appraiser who prepared Ex. B, his appraisal of

333 University Ave.  He has testified in court as an expert appraiser and his qualifications are not

in dispute.  Kosena was contacted by Rhoades to perform an appraisal for litigation.  He was paid

a flat fee in the sum of $2,500 for the appraisal, and paid $150 per hour for his testimony.  Ex. B

states on page 2 of the introduction Kosena's opinion of the market value of 333 University Ave.

as $936,000 as of November 3, 2008, assuming a marketing period of six months to a year.

Kosena testified that he prefers to go inside houses for which he prepares appraisals to

take his own measurements, and that he told his client about his concern that he could not see

inside 333 University Ave.  Kosena testified that he asked his client for access to the interior but

he was told that he could not go into the house[5].  He testified that he was not denied access by the

Shields.  Kosena had been inside 333 University Ave. when it was a fraternity house, and he

testified that it was a fraternity house for longer than it has been a residence.  Ex. B states,

however, under the summary of salient facts, that the historical use of the house was as single

---

[4]Chase ($396,388.98) + Sterling ($102,285.71) + Liberty Electric ($987.56) + Molly
Bennett ($60,383.87) + Allegra ($87,581.70) = $647,627.82.

[5]The docket does not reflect any motion by Allegra to allow inspection of the Debtor's
home by Kosena to prepare his appraisal.  The traditional practice in this Court is to allow
inspections of property for purposes of valuation, when requested, and such requests are seldom
if ever opposed.

family residential.

On pages 2 and 3 of Ex. B's summary of salient facts Kosena used square foot estimates for the interior of 333 University Ave., which he obtained from the Montana Department of Revenue ("DOR") because he was not allowed inside.  He testified that he was given anecdotal descriptions about the interior of the house from Castellanos, who is a principal of Allegra, and by someone identified as Mrs. Coffee ("Coffee").  Coffee provided Kosena with interior photographs which were in the MLS (Multiple Listing Service).  Kosena testified that the information which was provided to him was not as good as he wanted, but he used the information he had.

Kosena admitted a mistake on page 2 of Ex. B's summary of salient facts, where it refers to a private alley on the south of the property.  He testified that it is a public alley.  Page 3 of Ex. B's summary of salient facts refers to newer, double-hung windows with built-in screens. Kosena testified that if the windows are single-hung windows, then that is a mistake on Ex. B. Pages 3 and 4 of Ex. B's summary of salient facts, after noting Kosena's inability to inspect the interior, describes "several large bedrooms, bathrooms, and a large master suite with a fireplace, walk-in closet, and a full bath" on the subject home's second floor.  Kosena admitted that if the master bedroom does not have a closet or a master bath then it would affect his appraisal valuation, but he testified that he was told the master bedroom had a master bath.  Page 4 of Ex. B's summary of salient facts states Kosena's understanding that the basement is at least partially finished, "presumably with at least a family room."  If that is not true, Kosena testified that it might affect his opinion.

Page 4 of Ex. B's salient facts also states: "The residence is considered to be in excellent

physical condition." Kosena testified that Castellanos and Coffee both said the house was in

excellent condition, and that the condition was shown by the photographs he saw.  Next page 4

refers to the detached two-car garage which was built in 2007 and includes a finished second

level, "presumably, a 'mother-in-law' apartment."  Kosena testified that if the garage second

floor was not finished it would affect his value.

Kosena testified that, as of August 6, 2008, the real estate market in Missoula was going

into a recession.  He testified that during the first half of the period from August 2007 to August

2008 the Missoula housing market was stable, but that the second half showed a slight decline in

the market which Kosena describes as neutral to negative.

Kosena employed the sales comparison approach in arriving at his opinion of the value of

the Debtors' home[6].  Ex. B, pp. 11, 13, 25.  Within that approach Kosena employed the overall

dollars per square foot ("$/sf") as the one unit of comparison.  Ex. B., pp. 13, 25-26.  At Ex. B,

pp. 4, 20, 39, Kosena calculated the total above grade finished area ("GLA") (including the area

above the garage) at approximately 6,242 sf.

Kosena researched 16 comparable sales in the University District which are collected in

Table 3 on page 27 of Ex. B, in the years 2006, 2007 and 2008.  Kosena calculated the overall

$/sf by dividing the confirmed sales price of the comparable sales by the building area.

The first sale on Table 3 is of 1330 Gerald Ave., which sold in September 2008 for the

sum of $862,000.  Kosena testified that 1330 Gerald was a unique home on a corner lot site with

the lot containing 23,109 sf.  The improvements are listed as 4,842 sf above grade and 2,242 sf in

---

[6]He testified that the income approach did not apply, and he did not use the cost approach
because not many comparable land sales in the University District were available.

the basement, with 5 bedrooms and 4 baths, and a 2-car garage. Ex. B, p. 29. Table 3 lists 1330 Gerald at an overall $/sf of $144.73. Kosena testified that Debtors' home at 333 University is worth $74,000 more than 1330 Gerald at his valuation of $936,000, even though 1330 Gerald's lot is three times larger[7] and in Kosena's opinion is on a more valuable and desirable site than 333 University. At page 29 of Ex. B Kosena writes that the sale of 1330 Gerald is one of the better indicators for the value of the Debtors' home because it is the most recent sale, and 1330 Gerald had been renovated and updated.

The second best comparable sale on Ex. B, according to Kosena, is 205 Evans Ave, which sold for $825,000 in November 2006 after being listed for $995,000. Ex. B, pp. 27, 35. Kosena testified that he believed that the market at the time of the sale of 205 Evans was still going up. The site size of 205 Evans is almost twice as large as 333 University. 205 Evans had about 5,176 square feet of improvements above ground, and an unfinished basement. Ex. B, p. 35. Kosena states on Ex. B, p. 36 that 205 Evans had been remodeled and updated, and he calculated the overall $/sf for 205 Evans at $159.39/sf. Ex. B, pp. 27, 36.

The sale of another former fraternity house located at 1100 Gerald Ave. in 2007, listed at Ex. B, pp. 27 and 39, was given no consideration by Kosena because it involved a former fraternity that had not been updated at all. 1100 Gerald was a large home with about 6,902 square feet above ground. Kosena testified that he was told that 1100 Gerald was in poor condition. 1100 Gerald sold in August 2007 for $500,000, and Kosena calculated its overall $/sf at $72.25/sf. Ex. B, pp. 27, 39.

Kosena applied an overall $150/sf for 333 University Ave., based on the comparable sales

---

[7]Ex. B, p. 17, states the site area of 333 University as approximately 7,000 sf.

9

1 ($144.73/sf) and 11 ($159.39/sf). Ex. B, p. 39. Kosena multiplied by the $150/sf times 6,262[8]

sf and rounded his opinion of the value of 333 University Ave. to $936,000. Ex. B, p. 39.

On cross examination by Allegra's counsel, Kosena testified that if the basement of 333

University is unfinished it would result in a downward adjustment of his value opinion. Kosena

agreed that none of the basement footage went into the equation on page 39 of Ex. B, but he did

not agree that having the basement unfinished does not affect the value. He explained that the

$150/sf included the presumption that 333 University Ave. had a finished basement. Kosena

further testified that, if the condition of 333 University Ave. is good instead of excellent, then his

$150/sf estimate would decline. He declined on cross examination to quantify how much his

opinion would be adjusted downward if the condition was good rather than excellent and the

basement unfinished, describing those items as "not huge deals."

On direct examination by Rhoades, Kosena was asked to assume that the condition of 333

University is merely "good," that the upstairs of the garage is unfinished, and that no master

bathroom is included with the master suite. Rhoades then asked if those assumptions would

affect Kosena's $150/sf sale indication. Kosena responded that if all of Stevens' assumptions are

correct, Kosena would have used a sale indication of $145/sf instead of $150/sf. Rhoades then

asked Kosena what his opinion of the value of 333 University Ave. would be if he multiplied

$145/sf times what Rhoades mistakenly quoted as Stevens' measured footage of 333 University

Ave., 5,599[9] sf., Kosena answered that his new opinion of the value of 333 University Ave.

---

[8]Kosena's calculation using 6,262 on the bottom of page 39 of Ex. B is clearly a typo.
Two lines above he states the area as 6,242 sf.

[9]See below. Stevens measured the GLA footage of 333 University Ave. in Ex. 7, and the
resulting GLA is 5,559 sf, not 5,599.

10

would be $811,975, which he rounded up to $812,000.  By multiplying $145 times Stevens'

actual measurements of the GLA of 333 University Ave. of 5,559 sf the value equals $806,055.

**Stevens Testimony & Appraisal – Ex. 7.**

Tom Stevens is a MAI appraiser with thirty years of experience in the Missoula market.

He testified that he has appraised several homes in the University District, and in fact has

prepared appraisals of 333 University Ave. four times.  Stevens was paid between $750 to $1,000

for his appraisal, and $150 per hour for testifying.

Stevens described the real estate market in the University District as oversupplied, and

that the homes which have sold were marketed for a typical period of between four to six

months, at an average selling price of $632,000.  On cross examination when asked how he

concluded the market was oversupplied, Stevens answered that he based his answer on looking at

the MLS and talking to realtors involved in high-end real estate[10].

Ex. 7 is Stevens' appraisal[11] of 333 University Ave., and it states a final value in the

amount of $740,000 as of October 30, 2008, assuming a cash transaction and a market exposure

of between nine to twelve months[12].  Stevens testified that his $740,000 opinion of value dated

October 2008 would be consistent with his opinion of the market value in August 2008, without

adjustment.  If a shorter marketing period is used, Stevens testified, it would be necessary to

---

[10]Stevens described a previous housing shortage in the University District, which he could tell by the shorter marketing times and sales prices at or near the listing price.

[11]Ex. 7 utilizes a Form AI100.02 Summary Appraisal Report – Residential" form which appears to be generated by "WinTOTAL" appraisal software.  Stevens testified on cross examination that he used the form because it takes less time than writing a narrative report like Kosena's Ex. B.

[12]Ex. 7 is not paginated.

further reduce the price to sell.  Stevens agreed with Kosena that a recession existed in the

Missoula housing market in August 2008.  Stevens testified that, using hindsight, he would

extend the marketing period out to 18 to 24 months.

Stevens described the steps he took in preparing  Ex. 7.  He revisited 333 University Ave.

and inspected the interior and the grounds[13].  Stevens did not remeasure the inside area of 333

University Ave., because he testified that he had already measured the area twice.  Stevens

testified that his valuation differed from Kosena's primarily because Stevens performed an

interior inspection, while Kosena did not.

Stevens testified that he found a typographical error in Ex. 7 which misstates the above

grade gross living area ("GLA") as 5,339[14] square feet.  He testified that all his computations

were made using the correct GLA footage, which he measured, of 5,559 sf[15].  Stevens testified

that the DOR numbers which Kosena used to compute the GLA at 333 University Ave. are not

correct and affected the accuracy of Kosena's appraisal.  Stevens testified that the DOR grossly

overstated the GLA of 333 University Ave. and that Kosena should have used Stevens' actual

measurements instead of 6,242 sf.  No credible evidence exists in the record to the contrary in

---

[13]Stevens testified that he has performed appraisals without going inside properties, but that it is difficult to do and he prefers being able to inspect the interior.  He testified that Kosena did an admirable job, given the lack of an interior inspection.

[14]Stevens' testimony that the GLA was 5,339 sf in Ex. 7 is itself mistaken.  The GLA is included under the "Improvements Analysis" as 5,399.  The figure is again stated as 5,399 sf under the "Sales Comparison Approach Section."

[15]Ex. 7 includes, after the property photographs and maps, diagrams of the floors and their square footage.  Above grade GLA shown is 2,115 (first floor), 2,275 (second level), and 1,169 (third level).  This Court has added those up and confirmed Stevens' testimony that the GLA of 333 University Ave. totals 5,559 sf.  That does not include the basement square footage of 1,116 sf.

support of the accuracy of the DOR's measurements that Kosena used. The Court finds that the actual GLA of 333 University Ave. is 5,559 sf. Ex. 7 states the site size of 333 University as 7,800 sq. ft.

Stevens admitted to two scriveners' errors in the section of Ex. 7 titled "Improvements Analysis," which states that the GLA was "totally renovated approximately six years ago" and later again refers to "total renovation." He testified that the references to total renovation are not accurate, but that those errors do not change his opinion on the value.

On cross examinations Stevens was asked about whether he follows the guidelines or instructions for the appraisal form. He answered that he follows the guidelines to some extent, but not to the letter because the guidelines are for inexperienced appraisers, and that it is important to follow the guidelines for valuation only to the extent that the appraisal does not have an independent value.

Like Kosena, Stevens did not utilize the cost approach or the income approach in arriving at his valuation. Stevens testified that the cost approach was not appropriate[16], and that 333 University Ave. is not an income producing property so the income approach is not appropriate.

Stevens utilized three comparison sales in Ex. 7, which were among the 16 comparison sales cited by Kosena. Stevens described his valuation approach as "qualitative," using the three best comparison sales and making adjustments based on his 40 years of experience. He described Kosena's approach as "quantitative" where Kosena did not make specific adjustments.

---

[16]Because he did not use the cost approach, Stevens testified, he did not do a complete site evaluation which would be used in the cost approach. He also testified that he did not measure the GLA of the comparable sales, but followed the standard practice of relying on the MLS and DOR as sources.

Stevens testified that he has been in all three homes which he used as comparison sales during the last twelve months, during open houses.

Like Kosena, Stevens used the sale of 1330 Gerald Avenue, as "Comparison 3" on Ex. 7[17]. Stevens made several adjustments to the sale of 1330 Gerald to compare it with 333 University Ave., with a net adjustment of -$139,600 from the sale price of $862,000 of 1330 Gerald to an adjusted sale price of $722,400. The adjustments include a substantial $150,000 reduction to account for 1330 Gerald's much larger site[18]; a $50,000 reduction based on the condition of 1330 Gerald as "V. Good" compared with "Good" for 333 University Ave.; reductions for 333 University Ave.'s smaller, unfinished basement, and a $73,000 increase for 333 University Ave.'s larger GLA.

Comparison 1 on Ex. 7 is 1434 Gerald, which is comparison sale no. 7 on Ex. B page 27. Stevens adjusted the $800,000 sale price for 1434 Gerald downward by $50,000[19] to account for its seller financing by contract for deed, which Stevens learned about from the MLS and real estate agent. With other adjustments totaling a net $51,050 the adjusted sale price of 1434 Gerald was $748,950, due mostly to a larger site size but smaller GLA.

---

[17]The comparable sales and value indication are located in Ex. 7 immediately before the several pages of photographs.

[18]1330 Gerald's site size on Ex. 7, and Ex. B page 27, is 23,100 sf. On cross examination Rhoades suggested that Stevens should have included his calculation of this $150,000 adjustment for site size. Stevens responded that he did not feel it was relevant in his professional opinion.

[19]Stevens did not explain the $50,000 downward adjustment for seller financing of Comparison 1 on Ex. 7. Under cross examination Stevens testified that he does not normally include his calculation of the present value of the future benefit of seller financing in his appraisal reports, but he testified that seller financing has advantages which influenced the price by increasing it $50,000, which he deducted from the sale price of 1434 Gerald in his analysis.

14

Comparison 2 on Ex. 7 is a cash sale of 320 Keith (no. 5 on Ex. B p. 27) for $675,000. Stevens testified that an all cash transaction is what appraisers seek in finding what a willing buyer and willing seller with cash exchange at a given moment. Stevens made a $75,000 downward adjustment to the $675,000 sale price of 320 Keith to account for its "excellent" condition. He testified that in his opinion it would take $75,000 in improvements to bring the condition of 333 University Ave. up to the condition of 320 Keith[20]. The other adjustments to 320 Keith to account for its smaller GLA and basement, and single fireplace, raised its adjusted sale price to $747,550.

Stevens testified that 1330 Gerald's site value is far superior to 333 University Ave.'s site. With respect to the kitchen, Stevens testified that 333 University Ave. has a remodeled kitchen with concrete countertops, but that it is not in the same class as the kitchen at 1330 Gerald. He testified that 333 University Ave.'s condition is "good" in comparison with the other comparison sales. He explained that 333 University Ave. was in better than "fair" condition[21], and above average, but that it is not new construction since it was built in 1920. Stevens testified that some trim work has been done to 333 University Ave. but the work is not complete, and that the fact that it was converted from a fraternity house to a single family house is a problem unless a lot of money has been spent.

In the $500,000 price range for executive homes, Stevens explained, buyers expect that a bathroom exists for every two bedrooms. As a fraternity house, Stevens testified that 333

---

[20]Stevens admitted that his $75,000 adjustment is kind of subjective, but it depends on his professional judgment and the quality of construction.

[21]Stevens explained that for distressed houses he uses a discount of between 15 to 25 percent, but he did not exercise that discount for 333 University Ave.

University Ave. has six bedrooms but only two baths.  The bedrooms in 333 University Ave. are larger than in new houses, but Stevens testified that they have no closets, and the rooms do not have finished trim.  He testified that the master bedroom has a fireplace but does not have a closet or an attached bathroom, that the bathrooms are not located well, and that because of the condition of the floors there is a lot of noise.

Stevens testified that the owners of 333 University Ave. before Shields ran out of money and sold to Shields.  Stevens testified that the third floor is finished, but lacks a partition and the carpeting needs replacement.  He testified that most of the windows are original single hung windows, not double hung as stated in Kosena's appraisal.  The heating system in 333 University, Stevens testified, is gas forced-air.  However, he testified that in this price range a buyer would expect an ultra-high efficiency heating system.  Shields built the two-car garage next to 333 University, but Stevens testified that the upper floor of the garage, although large, is unfinished, has a rubber floor and no plumbing[22].

Stevens testified that he checked his $740,000 valuation opinion in Ex. 7 against what Shields purchased 333 University Ave. for, $500,000, and applied an average appreciation rate.  By doing so, he explained, he was using the subject property as its own best comparable.  He testified that the result was something less than $750,000, and verified his $740,000 opinion for the value of 333 University Ave. on Ex. 7.

**Sorum Testimony and CMA – Ex. A.**

Laurie Sorum has been a real estate agent since 1997.  She is not a broker, nor an

---

[22]Stevens testified that the value of the space above the garage is 520 sf, which would add value but is not finished and it was questionable for Kosena to include that space in his appraisal.

appraiser and she has not taken any appraisal courses. She has prepared several CMA's over the years when clients ask for them because they do not want the expense of an appraisal.

Ex. A is Sorum's CMA of 333 University Ave., dated September 26, 2008, and she testified that the market did not change from August 2008 to the date of her CMA. Sorum was paid $100 for preparing Ex. A. She did not have access to 333 University Ave. to prepare her CMA, but she testified that she would have preferred access. Instead she viewed the home from the alley and the sidewalk.

Ex. A states that a lack of homes exists in the area, which sold within the 6 to 8 month time frame she researched, so she used a July 14, 2006, sale of 805 Evans, which is comparable no. 14 on page 27 of Ex. B, in the sum of $880,000 "to justify my price range" of between $880,000 and $930,000, which is the range within which 333 University "would sell in today's market." Sorum notes on Ex. A's CMA Summary that the sale of 805 Evans took place when the housing market was on the rise. Sorum included 500 Keith, 1330 Gerald, and 500 University as comparable sales with a parallel level of amenities to 333 University Ave. She testified that she arrived at her price range by taking the listing price and sale price of her three comparable sales and divided by three.

## DISCUSSION

Debtors' move to avoid Allegra's judicial lien under § 522(f)(1)(A) to the extent it impairs their homestead exemption. The extent, if any, to which a judicial lien may be avoided is determined by the formula set forth in § 522(f)(2)(A). *Wolfson v. Watts (In re Watts)*, 298 F.3d 1077, 1079 (9th Cir. 2002). A lien is considered to impair an exemption under the formula of § 522(f)(2)(A) to the extent that the sum of "i. the lien; ii. all other liens on the property; and iii.

17

the amount of the exemption that the debtor could claim if there were no liens on the property;

exceeds the value that the debtor's interest in the property would have in the absence of any

liens." *Cal. Central Trust Bankcorp v. Been (In re Been)*, 153 F.3d 1034, 1036 (9th Cir. 1998).

The time to calculate the valuation and surplus equity is when the debtor filed a bankruptcy

petition. *Watts*, 298 F.3d at 1982; *In re Anderson*, 378 B.R. 296, 299, 301 (Bankr. W.D. Wash.

2007).

The instant case presents the opinions on the value of 333 University Ave. by two MAI

certified appraisers, Stevens and Kosena, of a real estate agent Sorum, and of the Debtors who

both supported Stevens' $740,000 value opinion.  This Court discussed the standard for

assigning weight to a debtor's testimony of the value of his property *In re Hungerford*, 19 Mont.

B.R. 103, 118-19 (Bankr. D. Mont. 2001):

> While a debtor's estimate of value may be acceptable in certain cases, the
> Court may give little weight to the opinion if not based upon sufficient facts.  *In re
> Schenk*, 67 B.R. 137, 140 (Bankr. Mont. 1986).  The determination of the weight to
> be given expert testimony or evidence is a matter within the discretion of the trier
> of fact – which in a nonjury proceeding like the  instant case is the bankruptcy
> court. *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990); *Arkwright Mutual
> Insurance Co. v. Gwinner Oil Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997); Barry
> Russell, *Bankruptcy Evidence Manual*, 2000 Ed., § 702.2.  In this contested matter,
> the trial court acts as a factfinder as well as a gatekeeper.  In such instances the
> court's discretion includes the weight to be accorded to the evidence.  4 Joseph M.
> McLaughlin, *Weinstein's Federal Evidence* § 702.05[2][a] (2nd ed. 2000).

The evidence shows Debtors listing 333 University Ave. for sale at a far greater price

than Stevens' appraised value, then listing it in their Schedules at considerably less.  However,

Debtors are entitled to estimate their value, and they corroborated Stevens' $740,000 value

opinion.

The Court gives little weight to Sorum's opinion or Ex. A.  Like Kosena, Sorum testified

18

that it would have been better if she had access to the interior of 333 University Ave., but she was not and no reason was given why she did not seek access. Sorum is not trained, educated or experienced as a real estate appraiser, so the Court views her opinion as having little weight for the purposes of Debtors' instant motion. Sorum's main comparison sale, 805 Evans, by her own admission took place when the housing market was on the rise, rather than during the current recession, and it appears in Ex. A to have been chosen to justify Sorum's price range. Sorum's methodology was not shown to be compatible or consistent with MAI standards, and her opinion was so far outside the range of those of the other experts, after Kosena's adjustment, that the Court in its discretion assigns Sorum's testimony and CMA, Ex. A, no weight.

As between Kosena's and Stevens' appraisals, Ex. 7 and B, the Court first notes that the evidence admitted at the hearing shows that Kosena used overstated GLA footage provided by the DOR of 6,242 sf. Ex. B, page 39. Stevens testified that the DOR overstated the GLA of 333 University Ave. No evidence exists to the contrary. Stevens' actual measurements in Ex. 7 show and the Court found above that the GLA of 333 University Ave. is 5,559 sf. Ex. B's value opinion for 333 University Ave. by Kosena of $936,000 at page 39 is based upon the mistaken 6,242 sf, and therefore the Court rejects Kosena's $936,000 appraisal opinion from Ex. B as based on mistaken fact.

Kosena adjusted his value opinion downward to account for Stevens' evaluation of 333 University Ave., and restated his opinion as $812,000 based on $145/sf. That opinion too is based on a mistaken GLA of 5,599 sf. Multiplying $145/sf times the actual measured GLA of 5,559 gives a value of $806,055.

In weighing the two adjusted values, the Court notes that Kosena desired, and he

19

specifically requested access to the interior of 333 University Ave. to perform his appraisal.  He testified that Shields did not refuse him access, but that he was told he could not inspect the interior.  Kosena admitted that he prefers to inspect the interior of properties when preparing appraisals.  Stevens agreed.  No explanation exists in the record why Allegra did not request access to 333 University so Kosena could perform his appraisal.  The Court weighs this lack of proof against Allegra, which had the right under long standing practice to request an inspection to perform the appraisal but failed to do so.

Allegra's failure to get Kosena access inside to perform his appraisal resulted in mistaken information about the condition of 333 University Ave. by Kosena.  Ex. B includes mistaken statements about the windows, the unfinished condition of the upstairs of the garage, the overall condition of the house, the existence of closets in the bedrooms, and the existence of a master bathroom.  In addition to mistakes, by relying on Allegra's principal Castellanos for information regarding the condition of the interior Kosena introduced bias of an adverse party into his professional opinion, which in this Court's view undermines the weight to be given his opinion.

Like Kosena, Stevens is a certified MAI appraiser.  Unlike Kosena, Stevens personally inspected the interior of the house and garage at 333 University Ave. in preparing Ex. 7.  Kosena testified that he prefers to inspect the interior of a home when performing an appraisal, and told his client his concern that he could not.

Kosena used several more comparison sales than Stevens used.  However, Kosena states in Ex. B, p. 39, that two of his comparison sales were most comparable to 333 University Ave.  Stevens used comparison sales which were used also by Kosena.  Stevens' methodology was consistent with MAI standards, and his opinion was based on his personal inspection of 333

20

University Ave., his 40 years experience in the market, and earlier appraisals of the same property.  The Court concludes that Stevens' opinion in Ex. 7 is entitled to the most weight, and finds and concludes that the value of 333 University Ave. was the amount of $740,000.00 as of August 6, 2008.

Under the formula of § 522(f)(2)(A), the sum of Allegra's lien ($87,581.70), all other liens of Chase ($396,388.98), Sterling ($102,285.71), Liberty Electric ($987.56), and Molly Bennett ($60,383.87), and the amount of exemption the Debtors could claim if there were no liens ($250,000) is $897,627.82, which exceeds the value that the Debtors' interest would have in the absence of any liens ($740,000) by the amount of $157,627.82.  Therefore Allegra's lien impairs the Debtors' homestead exemption under § 522(f)(2)(A) to an extent far in excess of the amount of Allegra's judicial lien, $87,581.70, and its lien is subject to avoidance in its entirety.

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction in this case under 28 U.S.C. § 1334(a).

2.  Debtors' motion to avoid Allegra's lien is a core proceeding under 28 U.S.C. § 157(b)(2)(K) and F.R.B.P. Rule 4003(b).

3.  The value of the Debtors' residence and homestead at 333 University Avenue in Missoula, Montana, on August 6, 2008, was $740,000.

4.  Under 11 U.S.C. § 522(f)(2)(A) the sum of Allegra's lien, all other liens on the Debtors' homestead, and the amount of exemption the Debtors could claim if there were no liens is $897,627.82, which exceeds the value that the Debtors' interest would have in the absence of any liens ($740,000) by the amount of $157,627.82.

5.  Allegra's lien impairs the Debtors' homestead exemption under § 522(f)(2)(A) in

excess of the extent of Allegra's judicial lien, $87,581.70, and Allegra's lien therefore is subject to avoidance in its entirety.

**IT IS ORDERED** a separate Order shall be entered in conformity with the above overruling Allegra's objection (Docket No. 30), granting Debtors' motion to avoid Allegra's judicial lien (Docket No. 27) and avoiding Allegra's judicial lien against Debtors' homestead located at 333 University Avenue, Missoula, Montana, arising from judgment entered in the Montana Fourth Judicial District Court, Missoula County, on September 27, 2007, Case No. DV-07-987, under 11 U.S.C. §§ 522(f)(1)(A) and 522 (f)(2)(A).

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana